UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MISSISSIPPI LIME COMPANY, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) |
| RJR MINING COMPANY, INC., | ) ) **Case No.** |
| Serve:<br>Otis R. Robinson, Jr., Registered Agent<br>7802 Hwy 78<br>Cordova, AL 35550 | ) ) **JURY TRIAL DEMANDED** ) ) ) ) |
| Defendant. | ) ) |

# COMPLAINT

Plaintiff Mississippi Lime Company ("**MLC**" or "**Plaintiff**"), by and through undersigned counsel, for its Complaint against Defendant RJR Mining Company, Inc. ("**RJR**" or "**Defendant**") states as follows:

## Preliminary Statement

1. This action is the result of Defendant RJR's failure to timely deliver to Plaintiff MLC the quantities and types of coal required by the parties' supply agreement and RJR's ultimate repudiation of the agreement. The coal required to be supplied pursuant to the agreement is critical for MLC's operation. As a result of RJR's breaches and repudiation of the supply agreement, MLC has suffered extensive damages.

## Parties

2. Plaintiff MLC is a corporation organized and existing under the laws of the state of Missouri (its state of incorporation), with its principal place of business in Missouri. Plaintiff's corporate headquarters is located in Saint Louis County, Missouri.

3. Defendant RJR is a corporation organized and existing under the laws of the state of Alabama (its state of incorporation), with its principal place of business in Alabama.

## Jurisdiction and Venue

4. This Court has jurisdiction under 28 U.S.C. § 1332, as there is complete diversity between the parties and the amount in controversy exceeds the sum or value of $75,000.00.

5. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (3), as a substantial part of the events giving rise to Plaintiff's claim occurred in this District, and, in any event, Defendant is subject to this Court's personal jurisdiction with respect to this action.

6. This Court has personal jurisdiction over Defendant. The contract at issue in this case (the "**Agreement**"), a copy of which is attached hereto as **Exhibit 1**, was accepted and made in Missouri. *See* Mo. Rev. Stat. § 506.500.1(2) (2022). Plaintiff received Defendant's offer at Plaintiff's corporate offices in Missouri. On September 9, 2020, Plaintiff promptly accepted the offer by affixing its signature on the written agreement.

7. Additionally, Defendant has sufficient minimum contacts with Missouri to satisfy the requirements of due process. Defendant purposefully availed itself of the forum by transacting repeated business with Plaintiff, a Missouri-based company whose corporate representatives are based in, and operate from, Missouri, and by sending a contract offer into Missouri, which was then accepted by a Missouri corporation in Missouri, and thus making a contract in Missouri—the contract out of which this dispute arises.

8. Further, Defendant and its representatives interacted with Plaintiff's Missouri-based representatives on multiple occasions; attempted to negotiate accommodations in connection with Defendant's obligations under the Agreement, which are part of the subject matter of Plaintiff's claims herein, with Plaintiff's Missouri-based representatives on multiple occasions;

and sent to Plaintiff's Missouri offices on multiple occasions product invoices directly tied to the subject matter of Plaintiff's claims herein, which Plaintiff paid from Missouri.

9. In addition, any other requirements necessary to satisfy the due process element of personal jurisdiction are met.

## Factual and General Allegations

**A. MLC and RJR Enter into the Agreement**

10. MLC is a leading supplier of high-calcium lime products and technical solutions.

11. MLC operates various production facilities across the country, including one in Calera, Alabama, where it manufactures high-calcium quicklime and hydrated lime products.

12. With over a century in the business, MLC has built its hard-earned reputation on, among other things, the high quality of its products and ability to deliver on customer orders.

13. MLC supplies customers across a number of industries and has built a reputation as a reliable supplier.

14. MLC's operations are highly dependent on a continuous and uninterrupted supply of fuel, including coal.

15. This continuous and uninterrupted supply of fuel, including coal, is therefore critical to MLC's ability and reputation as a reliable supplier of lime products across a number of industries.

16. RJR is a coal mining company and coal supplier.

17. The Agreement concerns MLC's purchases of coal from RJR to fuel MLC productions during the time period from September 9, 2020 through December 31, 2022. **Ex. 1**.

18. The Agreement required RJR to sell and deliver to MLC coal conforming to the specific quantity and delivery timing, quality, and price requirements set forth in the Agreement. **Ex. 1** at 1.

19. **Quantity:** During the term of the Agreement, September 9, 2020 through December 31, 2022, RJR was to be MLC's 100% coal supplier for the Calera facility excluding test burns. *Id.* RJR was required to supply MLC at the rate of 65,000 tons per year, with a minimum purchase requirement of 45,000 tons per year excluding 2020. *Id.* Each month, RJR was required to supply a quantity of coal via shipments that are "relatively uniform and consistent with the 65,000 annual tonnage" requirement. *Id.* at 1-2.

20. **Timing:** RJR was required to supply conforming coal sufficient to meet the Agreement's quantity requirements on at least a monthly basis. *Id.* at 1-2. However, the Agreement further provided that "[s]hipment dates" were "to be mutually agreed throughout the Term of this Agreement." *Id.* at 2. In practice, the parties mutually agreed to a much more frequent delivery schedule. Specifically, from the beginning of the Agreement's term, the parties mutually agreed to a schedule whereby RJR would deliver daily after receiving a weekly truck release from MLC the week prior. RJR would then invoice MLC weekly for the previous week's shipments.

21. **Quality:** All coal was required to be bituminous rank coal from Shannon Mine, 2" X 0 with 40% max passing ¼" with no intermediate sizes added or removed. *Id.* at 2. Further, all coal was required not to exceed any one or more of the rejection specifications set forth in a minimum/maximum chart on page 2 of the Agreement. *Id.* The rejection specifications set acceptable numerical ranges for the moisture, ash, and sulfur content, as well as the BTU (British thermal units) and V.M. (volatile matter), of all delivered coal. *Id.*

4

22. **Price:** The delivered price for coal conforming to the Agreement's requirements was fixed at $90/ton up to and including December 31, 2021, and then increased to $91/ton during calendar year 2022. *Id.*

23. Fulfillment of these quantity and timing, quality, and price requirements was necessary for MLC to continue operating its facility, and to do so in a reasonably profitable manner.

24. The Agreement is to be governed by Alabama substantive law. *Id.* at 4.

**B.     RJR Fails to Deliver Quantity and Quality of Coal Required by the Agreement**

25. On an ongoing basis beginning on or about the week of January 10, 2022, and continuing until July 15, 2022, RJR, without justification or excuse, materially breached its obligations with respect to the timing, quantity, and quality of coal delivered to MLC.

26. RJR's breaches include: (1) on multiple occasions during the stated period, failing to timely deliver to MLC the necessary quantity of coal required under the Agreement; and (2) continuously during the stated period, delivering coal to MLC that failed to meet the acceptable quality specifications required by the Agreement.

27. Amid these breaches, RJR's sales representative (Mr. Bruce Sanders) demanded a price increase from MLC (through Ms. Jo Anna Bailey), which was not required or justified under the Agreement.

28. These breaches have resulted in a multitude of costs, losses, and damages to MLC, which continue to accrue.

29. When RJR failed to timely deliver to MLC the necessary quantity of coal under the Agreement, MLC notified RJR of same within a reasonable time after discovering the breach.

30. When RJR failed to timely deliver the quantity of coal required by the Agreement, MLC, reasonably, in good faith, out of economic necessity and duress, and without unreasonable delay, obtained cover by purchasing reasonable substitute coal from third-party suppliers to replace delivery shortfalls caused by RJR.

31. When RJR delivered coal that failed to meet the acceptable quality specifications required by the Agreement, MLC notified RJR of same within a reasonable time after discovering the breach.

32. MLC, acting reasonably, in good faith, and out of economic necessity and duress, has retained any non-conforming coal delivered by RJR in order to keep its facility operating and to avoid even greater costs, losses, and damages.

33. Despite receiving reasonable and timely notification of these breaches, RJR failed to cure them.

**C.  RJR Threatens to Breach the Agreement in an Effort to Obtain Unjustified Price Increases, Then Overcharges and Continues to Violate the Agreement's Timing, Quantity, and Quality Requirements**

34. During a visit by Ms. Bailey to RJR's facility on March 10, 2022, Mr. Sanders threatened that RJR would further materially breach and repudiate the Agreement by halting deliveries of coal to MLC altogether.

35. RJR made this threat to try to leverage an unjustified surcharge from MLC, which RJR purported to be necessary due to increased fuel costs.

36. RJR has, and had, no right to the desired surcharge, under the Agreement or otherwise.

37. This threat by RJR constituted an anticipatory breach of the Agreement by RJR that would substantially impair the value of the Agreement to MLC.

38. Notwithstanding RJR's lack of entitlement to breach the Agreement and obtain the desired surcharge in this way, because such a fundamental repudiation by RJR would result in even more material and significant costs, losses, and damages to MLC, MLC, again acting reasonably, in good faith, and out of economic necessity and duress, acquiesced and decided to accommodate Mr. Sanders' demanded surcharge of $4.50/ton.

39. As part of a further discussion about RJR's performance for the balance of the 2022 contract term, Mr. Sanders represented that a price increase up to $139/ton would be needed for RJR to continue deliveries of coal for the remainder of the term—an increase of nearly 53% over the fixed price of $91/ton as required by the Agreement.

40. RJR has, and had, no right to the desired drastically increased per-ton coal price, under the Agreement or otherwise.

41. MLC, once again acting reasonably, in good faith, and out of economic necessity and duress, and in order to keep its facility operating and to avoid even greater costs, losses, and damages, decided to accommodate RJR's demanded price increase on a temporary basis beginning March 15, 2022.

42. Importantly, MLC's agreement with RJR to this temporary accommodation was subject to, and expressly conditioned on, compliance by RJR with all of the following conditions:

    a. All coal delivered by RJR must conform to the specifications of the Agreement;

    b. Each week, RJR must satisfy volumes requested by MLC in weekly truck releases;

    c. RJR must provide coal quality transparency via testing reports from RJR's mine seams; and

    d. RJR must provide financial documentation so that MLC could better understand RJR's financial position and costs.

43. Notwithstanding the express nature of these conditions and MLC's clear communication on these points, RJR violated the negotiated accommodation.

44. Specifically, RJR failed to comply with the express conditions agreed to by the parties.

45. Nevertheless, RJR immediately began invoicing certain deliveries to MLC at the increased price of $139/ton.

46. When reminded that the temporary price accommodation was conditional as described above, RJR provided some information on coal quality and financial matters, but failed to comply with any of the other agreed-to conditions.

47. RJR's imposition on MLC of the $139/ton price violated the Agreement, which only allowed RJR to charge MLC the fixed price of $91/ton delivered during 2022.

48. Further, RJR continued to deliver less than the required volume of coal and continued to deliver coal of nonconforming quality, both independent continuing breaches of the Agreement.

49. These breaches by RJR are not justified or excused by the temporary price accommodation the parties had negotiated, because RJR breached express conditions of that agreement and thus MLC's alternative performance obligations under that agreement were never triggered.

50. Additionally, despite RJR's continuing breaches and lack of entitlement to its demanded $4.50 fuel surcharge, RJR also invoiced certain deliveries after March 10, 2022 inclusive of that surcharge, at $95.50/ton.

51. These breaches have resulted in a multitude of costs, losses, and damages to MLC, which continue to accrue.

52. When RJR failed to timely deliver to MLC the necessary quantity of coal under the Agreement, MLC notified RJR of same within a reasonable time after discovering the breach.

53. When RJR failed to timely deliver the quantity of coal required by the Agreement, MLC, reasonably, in good faith, out of economic necessity and duress, and without unreasonable delay, obtained cover by purchasing reasonable substitute coal from third-party suppliers to replace the delivery shortfalls caused by RJR.

54. When RJR delivered coal that failed to meet the acceptable quality specifications required by the Agreement, MLC notified RJR of same within a reasonable time after discovering the breach.

55. MLC, acting reasonably, in good faith, and out of economic necessity and duress, has retained any non-conforming coal delivered by RJR in order to keep its facility operating and to avoid even greater costs, losses, and damages.

56. Despite receiving reasonable and timely notification of these breaches, RJR has failed to cure them.

**D.  RJR Makes Additional Threats and Repudiates the Agreement**

57. In a discussion on May 11, 2022, involving Ms. Bailey, Mr. Sanders, and RJR's President and owner (Mr. Randy Robinson), RJR's representatives again threatened to breach and repudiate the Agreement, this time by threatening to materially curtail or close down RJR's operations within three to four weeks, at which point RJR would cease to provide MLC with any coal.

58. Subsequently, on May 24, 2022, RJR informed MLC via email that RJR's mining activities would be "wrap[ping] up in the next 2 – 2.5 weeks," i.e., by early June 2022, and that

9

RJR would only have enough coal left to ship "for the next two (2) months from today," i.e., would have no coal left to ship to MLC after July 24, 2022.

59. Such actions constitute an anticipatory repudiation of the Agreement by RJR that substantially impaired the value of the Agreement to MLC.

60. At no time did RJR retract this repudiation.

**E.    MLC Lawfully Terminates the Agreement and Obtains Cover for the Remainder of the Agreement's Term**

61. Given the foregoing, by mid-2022 it was abundantly clear that RJR was not going to cure its longstanding breaches or make MLC whole for its resulting costs, losses, and damages, and was in fact repudiating the Agreement altogether.

62. Accordingly, MLC terminated the Agreement effective July 15, 2022, without renunciation or discharge of any claim for damages or any other available remedies against RJR.

63. MLC notified RJR of same in writing on July 15, 2022.

64. At no time has RJR cured any of its breaches of the Agreement.

65. Because of RJR's breaches, MLC has been damaged as described above and below herein.

66. MLC has also been damaged in the form of cover for purchasing, in good faith and without unreasonable delay, reasonable substitute coal from third-party suppliers to replace the remaining tons of coal that would have been delivered to MLC from the date of termination through December 31, 2022 absent termination due to RJR's breaches and repudiation.

67. Altogether, MLC's actual damages are at least $3.5 million. In addition, MLC has incurred incidental and consequential damages, including but not limited to challenges with product quality and reputational harm, because of RJR's breaches.

10

**COUNT I – BREACH OF CONTRACT (TIMING AND QUANTITY REQUIREMENTS)**

68. Plaintiff restates and re-alleges Paragraphs 1 through 67 as if fully set forth herein.

69. The Agreement is valid and enforceable.

70. During the term of the Agreement, September 9, 2020 through December 31, 2022, RJR was required to supply MLC at the rate of 65,000 tons per year. **Ex. 1** at 1-2.

71. RJR was required to supply the coal via shipments that are "relatively uniform and consistent with the 65,000 annual tonnage" requirement. *Id.*

72. On multiple occasions between approximately January 10, 2022 and continuing until July 15, 2022, RJR materially breached the Agreement's timing and quantity requirements.

73. Specifically, RJR failed to timely deliver to MLC the quantity of coal required under the Agreement, namely, approximately 5,417 tons on a per-month basis, divided into daily shipments.

74. Each such failure by RJR caused substantial delivery shortfalls for MLC relative to its requirements.

75. When RJR failed to timely deliver to MLC the necessary quantity of coal under the Agreement, MLC notified RJR of same within a reasonable time after discovering the breach.

76. When RJR failed to timely deliver the quantity of coal required by the Agreement, MLC, reasonably, in good faith, out of economic necessity and duress, and without unreasonable delay, obtained cover by purchasing reasonable substitute coal from third-party suppliers to replace the delivery shortfalls caused by RJR.

77. Despite receiving reasonable and timely notification of these breaches, RJR has failed to cure them.

78. RJR's breaches of the Agreement's timing and quantity requirements are without justification or excuse.

79. At all relevant times, MLC materially complied with its performance obligations under the Agreement.

80. As a direct and proximate result of RJR's breaches, MLC has been materially damaged.

81. MLC is entitled to recover damages, including but not limited to the difference between the cover price of MLC's purchases of reasonable substitute coal from third parties to replace the delivery shortfalls caused by RJR and the contract price of $91/ton for 2022 for the same quantity of coal, together with MLC's incidental and consequential damages. Ala. Code § 7-2-712 (2022). MLC's consequential damages include, but are not limited to, challenges with product quality and reputational harm.

WHEREFORE, Plaintiff Mississippi Lime Company respectfully requests that this Court enter judgment in favor of Plaintiff Mississippi Lime Company and against Defendant RJR Mining Company, Inc. for its actual damages together with its incidental and consequential damages, and grant such other and further relief as the Court deems just and proper.

## COUNT II – BREACH OF CONTRACT (QUALITY REQUIREMENTS)

82. Plaintiff restates and re-alleges Paragraphs 1 through 81 as if fully set forth herein.

83. The Agreement is valid and enforceable.

84. During the term of the Agreement, September 9, 2020 through December 31, 2022, all coal delivered by RJR to MLC was required to be bituminous rank coal from Shannon Mine, 2" X 0 with 40% max passing ¼" with no intermediate sizes added or removed. **Ex. 1** at 2.

85. Further, all coal was required not to exceed any one or more of the minimum/maximum rejection specifications set forth in the Agreement. *Id.* The rejection specifications set acceptable numerical ranges for the moisture, ash, and sulfur content, as well as the BTU and V.M., of all delivered coal. *Id.*

86. On a continuous basis between approximately January 10, 2022 and July 15, 2022, RJR materially breached the Agreement by delivering coal to MLC that failed to meet the acceptable quality specifications required by the Agreement.

87. Specifically, during the stated period, each delivery by RJR exceeded one or more of the minimum/maximum content rejection thresholds for moisture, ash, sulfur, BTU, and/or V.M.

88. When RJR delivered coal that failed to meet the acceptable quality specifications required by the Agreement, MLC notified RJR of same within a reasonable time after discovering the breach.

89. MLC, acting reasonably, in good faith, and out of economic necessity and duress, has retained any non-conforming coal delivered by RJR in order to keep its facility operating and to avoid even greater costs, losses, and damages.

90. Despite receiving reasonable and timely notification of these breaches, RJR has failed to cure them.

91. RJR's breaches of the Agreement's quality requirements are without justification or excuse.

92. At all relevant times, MLC materially complied with its performance obligations under the Agreement.

93. As a direct and proximate result of RJR's breach, MLC has been materially damaged.

94. MLC is entitled to recover damages, including but not limited to the difference, calculated at the time and place of MLC's acceptance of each delivery of nonconforming coal, between the value of the nonconforming coal delivered by RJR and the value the coal would have had if it had been of acceptable quality under the Agreement, together with MLC's incidental and consequential damages. Ala. Code § 7-2-714 (2022). MLC's consequential damages include, but are not limited to, challenges with product quality and reputational harm.

WHEREFORE, Plaintiff Mississippi Lime Company respectfully requests that this Court enter judgment in favor of Plaintiff Mississippi Lime Company and against Defendant RJR Mining Company, Inc. for its actual damages together with its incidental and consequential damages, and grant such other and further relief as the Court deems just and proper.

## COUNT III – BREACH OF CONTRACT (OVERCHARGING)

95. Plaintiff restates and re-alleges Paragraphs 1 through 94 as if fully set forth herein.

96. The Agreement is valid and enforceable.

97. Under the Agreement, the price of coal delivered by RJR to MLC was fixed at $91/ton for calendar year 2022. **Ex. 1** at 2.

98. On March 10, 2022, RJR threatened to repudiate the Agreement in an effort to extract an unjustified price surcharge from MLC.

99. RJR then represented to MLC that a price increase up to $139/ton would be needed for RJR to continue deliveries of coal for the remainder of the contract term.

14

100. Despite RJR's lack of entitlement to the desired price increase, MLC, once again acting reasonably, in good faith, out of economic necessity and duress, and in order to keep its facility operating and to avoid even greater costs, losses, and damages, decided to accommodate RJR's demanded price increase on a temporary basis beginning March 15, 2022.

101. MLC's agreement with RJR to this temporary accommodation was subject to, and expressly conditioned on, compliance by RJR with four conditions.

102. RJR violated the negotiated accommodation by failing to comply with the express agreed-to conditions.

103. Thus, MLC's obligation to pay $139/ton for delivered coal on a temporary basis was never triggered.

104. Nevertheless, RJR immediately began invoicing certain deliveries to MLC at the increased price of $139/ton.

105. RJR's imposition of the $139/ton price violated the Agreement, which only allowed RJR to charge MLC the fixed price of $91/ton delivered during 2022.

106. To the extent MLC paid any of the $139/ton invoices from RJR, MLC did so out of economic necessity and duress.

107. RJR's breaches of the Agreement's price requirements are without justification or excuse.

108. At all relevant times, MLC materially complied with its performance obligations under the Agreement.

109. As a direct and proximate result of RJR's breaches, MLC has been materially damaged.

110. MLC is entitled to recover damages, including but not limited to the difference between what MLC paid RJR for delivered coal in 2022 at any price above $91/ton and what MLC would have paid RJR for that coal at the fixed contract price of $91/ton, together with MLC's incidental and consequential damages. MLC's consequential damages include, but are not limited to, challenges with product quality and reputational harm.

WHEREFORE, Plaintiff Mississippi Lime Company respectfully requests that this Court enter judgment in favor of Plaintiff Mississippi Lime Company and against Defendant RJR Mining Company, Inc. for its actual damages together with its incidental and consequential damages, and grant such other and further relief as the Court deems just and proper.

### COUNT IV – BREACH OF CONTRACT (OVERCHARGING)

111. Plaintiff restates and re-alleges Paragraphs 1 through 110 as if fully set forth herein.

112. The Agreement is valid and enforceable.

113. Under the Agreement, the price of coal delivered by RJR to MLC was fixed at $91/ton for calendar year 2022. **Ex. 1** at 2.

114. On March 10, 2022, RJR used the threat of repudiation of the Agreement to try to extract an unjustified purported fuel surcharge of $4.50/ton out of MLC.

115. Between March 10, 2022 and July 15, 2022, RJR continued to deliver less than the required volume of coal and continued to deliver coal of nonconforming quality, both independent continuing breaches of the Agreement.

116. Nevertheless, despite RJR's continuing breaches and lack of entitlement to its demanded $4.50 fuel surcharge, RJR also invoiced certain deliveries after March 10, 2022 inclusive of that surcharge, at $95.50/ton.

117. MLC cannot be liable for the price surcharge imposed by RJR, because RJR breached its obligations under the Agreement as to any coal deliveries or purported coal deliveries for which RJR invoiced MLC at $95.50/ton.

118. RJR's imposition of the $95.50/ton price violated the Agreement, which only allowed RJR to charge MLC the fixed price of $91/ton delivered during 2022.

119. To the extent MLC paid any of the $95.50/ton invoices from RJR, MLC did so out of economic necessity and duress.

120. RJR's breaches of the Agreement's price requirements are without justification or excuse.

121. At all relevant times, MLC materially complied with its performance obligations under the Agreement.

122. As a direct and proximate result of RJR's breaches, MLC has been materially damaged.

123. MLC is entitled to recover damages, including but not limited to the difference between what MLC paid RJR for delivered coal in 2022 at any price above $91/ton and what MLC would have paid RJR for that coal at the fixed contract price of $91/ton, together with MLC's incidental and consequential damages. MLC's consequential damages include, but are not limited to, challenges with product quality and reputational harm.

WHEREFORE, Plaintiff Mississippi Lime Company respectfully requests that this Court enter judgment in favor of Plaintiff Mississippi Lime Company and against Defendant RJR Mining Company, Inc. for its actual damages together with its incidental and consequential damages, and grant such other and further relief as the Court deems just and proper.

## COUNT V – BREACH OF CONTRACT (REPUDIATION)

124. Plaintiff restates and re-alleges Paragraphs 1 through 123 as if fully set forth herein.

125. The Agreement is valid and enforceable.

126. On May 11, 2022, RJR again threatened to breach and repudiate the Agreement, this time by threatening to materially curtail or close down RJR's operations within three to four weeks, at which point RJR would cease to provide MLC with any coal.

127. Subsequently, on May 24, 2022, RJR informed MLC that RJR would cease all of its mining activities by early June 2022, and that RJR would only have enough coal left to deliver to MLC for the next two months, i.e., would have no coal left to ship to MLC after July 24, 2022.

128. RJR's coal delivery requirements under the Agreement ran through the remainder of the Agreement's term, December 31, 2022.

129. The Agreement required deliveries of conforming coal by RJR to MLC so as to satisfy the requirement of 65,000 tons of coal delivered in 2022, divided into "relatively uniform and consistent" shipments. **Ex. 1** at 1-2.

130. Accordingly, RJR anticipatorily repudiated the Agreement in a way that substantially impaired the value of the Agreement to MLC.

131. MLC notified RJR that RJR's repudiation was a breach of the Agreement within a reasonable time after learning of same.

132. Because a continuous and uninterrupted supply of coal is critical to MLC's operations, and a lack of required coal supply for even a short period of time is extremely harmful to MLC's operations, MLC had to act quickly to obtain appropriate cover for the remainder of the Agreement's term in response to RJR's repudiation.

133. Because of RJR's repudiation and other breaches of the Agreement, MLC validly terminated the Agreement effective July 15, 2022.

134. Once the Agreement was terminated, MLC, in good faith and without unreasonable delay, obtained cover by purchasing reasonable substitute coal from third-party suppliers to replace the remaining tons of coal that would have been delivered to MLC from the date of termination through December 31, 2022 absent termination due to RJR's breaches and repudiation.

135. Despite receiving reasonable and timely notification that its repudiation was a breach of the Agreement, RJR failed to retract its repudiation.

136. RJR's repudiation is without justification or excuse.

137. At all relevant times, MLC materially complied with its performance obligations under the Agreement.

138. As a direct and proximate result of RJR's breach, MLC has been materially damaged.

139. MLC is entitled to recover damages, including but not limited to the difference between the cover price of MLC's purchases of reasonable substitute coal from third parties from July 15, 2022 through December 31, 2022 and the fixed Agreement price for coal of $91/ton delivered in 2022 for the same quantity of coal, together with MLC's incidental and consequential damages.  Ala. Code § 7-2-712 (2022).  MLC's consequential damages include, but are not limited to, challenges with product quality and reputational harm.

WHEREFORE, Plaintiff Mississippi Lime Company respectfully requests that this Court enter judgment in favor of Plaintiff Mississippi Lime Company and against Defendant RJR Mining Company, Inc. for its actual damages together with its incidental and consequential damages, and grant such other and further relief as the Court deems just and proper.

|  |  |
|---|---|
| Dated: August 30, 2022 | By: */s/ Jeffrey L. Schultz* |

                        Jeffrey L. Schultz      #56553MO
                        Daniel R. O'Brien      #69258MO
                        Armstrong Teasdale LLP
                        7700 Forsyth Blvd., Suite 1800
                        St. Louis, Missouri 63105
                        Telephone:  314.621.5070
                        Fax:  314.621.5065
                        jschultz@atllp.com
                        dobrien@atllp.com

                        ATTORNEYS FOR PLAINTIFF MISSISSIPPI LIME COMPANY