UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MISSISSIPPI LIME COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:22-cv-00910-AGF |
| | ) | |
| RJR MINING COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant RJR Mining Company, Inc.'s

("RJR") motion to dismiss for lack of personal jurisdiction and improper venue under

Fed. R. Civ. P. 12(b)(2) and (3).  ECF Nos. 12 and 13.  RJR argues it is not subject to

personal jurisdiction in Missouri because it is not subject to Missouri's long-arm statute,

Mo. Rev. Stat. § 506.600.1, and lacks sufficient minimum contacts with Missouri.  RJR

further argues that venue is improper in the Eastern District of Missouri, and requests

that, if the Court finds personal jurisdiction over RJR, the Court transfer the case to the

Northern District of Alabama under 28 U.S.C. § 1404(a) for the convenience of the

parties and witnesses.

Plaintiff Mississippi Lime Company ("MLC") opposes the motion, arguing that

RJR's actions in entering into a contract with MLC in Missouri confers jurisdiction under

Missouri's long-arm statute and that RJR has sufficient minimum contacts with Missouri

to confer this Court with jurisdiction.  MLC also argues that venue is proper in this Court

1

and that transfer is unnecessary.  ECF No. 17.

RJR filed a reply in support of its motion.  ECF No. 20.  Plaintiff then filed a sur-reply with leave of court.  ECF No. 25.  This matter is now fully briefed and ready for disposition.  For the reasons discussed below, the Court will grant Defendant's motion to dismiss for lack of personal jurisdiction.

## Background

Plaintiff's Complaint arises out of Defendant's alleged breaches of a coal supply agreement (the "Agreement").  ECF No. 1.  The bulk of the facts pertaining to jurisdiction are undisputed.  MLC is a Missouri corporation with its principal place of business in Missouri.  RJR is an Alabama corporation with its principal place of business in Alabama.  In early 2020, RJR's Alabama-based Manager of Coal Sales and Quality, Justin Marcum, contacted MLC's Missouri-based employee, Christopher Daniel, to solicit MLC's business.[1]  Declaration of Jo Anna Bailey ("Bailey Declaration"), ECF No. 17-2 at ¶ 4.  Mr. Marcum continued discussions with Mr. Daniel and another of MLC's Missouri-based employees, Jo Anna Bailey.  *Id.* at ¶ 5.  Mr. Marcum later called Ms. Bailey to make another pitch for MLC's business.  *Id.* at ¶ 6; ECF No. 17-3.  Mr. Marcum, while still in Alabama, negotiated the terms of the Agreement with Ms. Bailey by phone and email while Ms. Bailey was in Missouri.  Bailey Declaration at ¶ 9.

---

[1]     RJR has submitted the Declaration of Otis R. Robinson, Jr., RJR's president, to support its motion to dismiss.  *See* ECF No. 13-1 ("Robinson Declaration").  He declares that "RJR has never directly advertised or solicited business in Missouri." *Id.* at ¶ 6.  For the purposes of this motion to dismiss, the Court need not resolve factual disputes. *Angelica Corp. v. Gallery Mfg. Corp.*, 904 F. Supp. 993, 996 (E.D. Mo. 1995).

The parties entered into the Agreement in September 2020. Under the Agreement's terms, RJR was to supply coal to MCL's production facility in Calera, Alabama (the "Calera Facility"). The Agreement included requirements for the quantity of coal to be delivered, the timing of deliveries, minimum quality standards of the coal to be delivered, and price. All of the coal was to be mined at RJR's Shannon Mine site in Alabama. ECF No. 1 at ¶¶ 11, 17,19–22; ECF No. 1-1 at 1. The Agreement specifies that Alabama law will govern the agreement. ECF No. 1 at ¶ 24; ECF No. 1-1 at 4.

Plaintiff alleges that, by early 2022, RJR began to repeatedly breach the Agreement. MLC alleges that between January and July 2022, RJR repeatedly failed to make timely coal deliveries to the Calera Facility and that coal that was delivered failed to meet the Agreement's quality requirements. ECF No. 1 at ¶ 26. Next, MLC alleges that on March 10, 2022, while Ms. Bailey was visiting RJR's facility in Alabama, RJR threatened to breach the Agreement unless it could: (1) include a fuel surcharge on any future deliveries, and (2) increase the coal's price per ton from $91 to $139. *Id.* at ¶¶ 34–35, 36, 39. MLC alleges that it accepted the $4.50 per ton fuel surcharge and agreed to pay the requested $139 price per ton on a temporary basis, subject to certain conditions. *Id.* at ¶¶ 38, 41–42. MLC alleges that RJR immediately began invoicing deliveries with the fuel surcharge and at the higher per ton price while it continued to violate the Agreement and MLC's new conditions. *Id.* at ¶¶ 43–45, 48, 50. MLC then alleges that in May 2022, RJR again threatened to breach the Agreement, saying it would curtail or close down operations at the Shannon Mine site and stop all coal deliveries to the Calera Facility within a matter of weeks. *Id.* at ¶ 57–58. Finally, MLC alleges that MLC

terminated the Agreement in writing on July 15, 2022.  *Id.* at ¶¶ 62–63.

Based on these allegations, MLC raises five separate claims for breach of contract: Count I – for breaches of the Agreement's timing and quantity requirements; Count II – for breaches of the Agreements' quality requirements; Count III – for overcharging via the increased price per ton; Count IV – for overcharging via the $4.50 fuel surcharge; and Count V – for repudiation of the Agreement.

Plaintiff brings this action pursuant to the Court's diversity jurisdiction under 28 U.S.C. § 1332, as MLC is a Missouri corporation with its principal place of business in Missouri, RJR is an Alabama corporation with its principal place of business in Alabama, and the amount in controversy exceeds the sum or value of $75,000.  MCL claims venue is proper under 28 U.S.C. § 1391(b)(2) and (3) because "a substantial part of the events giving rise to [its] claim occurred in this District" and RJR "is subject to this Court's personal jurisdiction with respect to this action."  ECF No. 1 at ¶ 5.  In support of this latter claim, MLC alleges that the Agreement was formed in Missouri when MLC accepted RJR's offer at MLC's corporate offices in Missouri, thus triggering Missouri's long-arm statute.  *Id.* at ¶ 6 (citing Mo. Rev. Stat. § 506.500.1(2)).  MLC also alleges that RJR has sufficient minimum contacts with Missouri to satisfy the requirements of due process, namely that:

> 7.     . . . Defendant purposefully availed itself of the forum by transacting repeated business with Plaintiff, a Missouri-based company whose corporate representatives are based in, and operate from, Missouri, and by sending a contract offer into Missouri, which was then accepted by a Missouri corporation in Missouri, and thus making a contract in Missouri— the contract out of which this dispute arises.

8.      Further, Defendant and its representatives interacted with Plaintiff's Missouri-based representatives on multiple occasions; attempted to negotiate accommodations in connection with Defendant's obligations under the Agreement, which are part of the subject matter of Plaintiff's claims herein, with Plaintiff's Missouri-based representatives on multiple occasions; and sent to Plaintiff's Missouri offices on multiple occasions product invoices directly tied to the subject matter of Plaintiff's claims herein, which Plaintiff paid from Missouri.

ECF No. 1 at ¶¶ 7–8.

## Legal Standard

"When personal jurisdiction is challenged by a defendant, the plaintiff bears the burden to show that jurisdiction exists." *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014).  "To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that personal jurisdiction exists . . . ." *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011) (citations omitted).  "A plaintiff's prima facie showing must be tested, not by the pleadings alone, but by affidavits and exhibits supporting or opposing the motion." *Fastpath*, 760 F.3d at 820 (citations omitted).  The court must view the evidence "in a light most favorable to the plaintiff and resolve factual conflicts in the plaintiff's favor; however, the party seeking to establish the court's personal jurisdiction carries the burden of proof and that burden does not shift to the party challenging jurisdiction." *Id.*

There are two types of personal jurisdiction: general and specific. *Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014).  "General jurisdiction exists where a defendant is essentially at home in the forum state, whereas specific jurisdiction covers defendants less intimately connected with a State, but only as to a narrower class of claims, namely

those that arise out of or relate to the defendant's contacts with the forum." *Bros. &
Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 952 (8th Cir. 2022).  Here, MLC
alleges only that RJR is subject to specific jurisdiction in Missouri.

"Personal jurisdiction in a diversity case exists only to the extent permitted by the
long-arm statute of the forum state and by the Due Process Clause."  *K-V Pharm.*, 648
F.3d at 592 (citations omitted).  These are separate inquiries, and both must be met to
allow personal jurisdiction over a foreign defendant.  *Dairy Farmers of Am., Inc. v.
Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 475–76 (8th Cir. 2012).  MLC contends that
RJR transacted business within the state and entered into a contract in Missouri, within
the meaning of Missouri's long-arm statute, Mo. Rev. Stat. § 506.500.1.  But the Court
need not address the question of compliance with Missouri's long-arm statute because
Plaintiff has not met its burden to establish that the exercise of personal jurisdiction over
RJR satisfies the requirements of due process.[2]

Due process requires that there be "sufficient minimum contacts between a
defendant and the forum state so that jurisdiction over a defendant with such contacts
may not offend traditional notions of fair play and substantial justice."  *Aly v. Hanzada
for Import & Export Co., LTD*, 864 F.3d 844, 849 (8th Cir. 2017) (citations and internal
quotation marks omitted).  Notably, "[a] contract between a plaintiff and an out-of-state

---

[2]     The Court notes that the Eighth Circuit in *Dairy Farmers* found that defendant
Bassett did not transact business in Missouri, within the reach of the long-arm statute, as
Bassett sent no product to Missouri and ordered none from Missouri; did not advertise in
the state; no Bassett employee ever entered the state; and Bassett's communication with
the plaintiff's headquarters in Missouri by phone, email, and fax did not alone constitute
the transaction of business.  The same can be said of RJR in this case.

defendant is not sufficient in and of itself to establish personal jurisdiction over the defendant in the plaintiff's forum state." *Fastpath*, 760 F.3d at 821 (discussing specific personal jurisdiction with respect to a contract dispute) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478–79 (1985) (discussing personal jurisdiction with respect to a franchise agreement)). "This is particularly true when all elements of the defendant's performance are to take place outside of the forum." *Vetta-Zelo, Inc. v. Ideum, Inc.*, Civ. No. 13-367, 2013 WL 3177804, at *4 (D. Minn. June 24, 2013) (citing *Iowa Elec. Light & Power Co. v. Atlas Corp.*, 603 F.2d 1301, 1303–04 (8th Cir. 1979)).

"A defendant's contacts with the forum state must be sufficient so that a non-resident defendant should reasonably anticipate being haled into court there." *Fastpath*, 760 F.3d at 820–21 (citing *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980). "Sufficient minimum contacts requires some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* at 821 (citation and internal quotation marks omitted). This requirement "ensures that a defendant will not be haled into a jurisdiction solely as the result of random, fortuitous, or attenuated contact or of the unilateral activity or another party or a third person." *Id.* (quoting *Stanton v. St. Jude Med., Inc.*, 340 F.3d 690, 693–94 (8th Cir. 2003)). Importantly, the relationship between the defendant and the action must arise out of contacts that the defendant itself creates with the forum state, and contacts between the plaintiff and the forum state do not satisfy this inquiry. *Id.* (quoting *Burger King*, 471 U.S. at 475).

In assessing a defendant's minimum contacts with the forum, district courts in the

Eighth Circuit consider five factors: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of those contacts; (3) the relationship of those contacts with the cause of action; (4) Missouri's interest in providing a forum for its residents; and (5) the convenience or inconvenience to the parties." *Id.* Courts give "significant weight to the first three factors." *Id.* "In judging minimum contacts, a court properly focuses on the relationship among the defendant, the forum, and the litigation." *Enterprise Rent-A-Car Co. v. U-Haul Int'l, Inc.*, 327 F. Supp. 2d 1032, 1036 (E.D. Mo. 2004) (citing *Calder v. Jones*, 465 U.S. 783, 788 (1984)).

## Discussion

MLC's allegations of RJR's minimum contacts with Missouri are limited. MLC alleges that: (1) RJR purposefully reached out to MLC representatives in Missouri via email and phone to form a contract for the sale of coal; (2) RJR interacted with and negotiated the Agreement with MLC's Missouri-based representatives through email and phone; (3) RJR sent its contract offer to MLC for acceptance in Missouri; and (4) RJR communicated with MLC's Missouri-based personnel throughout the Agreement's lifetime. *See* ECF No. 17 at 2.

RJR argues that these contacts are insufficient to confer personal jurisdiction over it. RJR points to several factors that it claims disfavor a finding of personal jurisdiction: (1) the Agreement is for the sale of coal mined by RJR in Alabama—not Missouri—to MLC's facility in Alabama—not Missouri; (2) all of RJR's operations and employees are in Alabama; (3) none of RJR's employees entered Missouri at any time to negotiate the Agreement; (4) the testing of coal's quality was done at a third-party company's lab in

Alabama, per the terms of the Agreement; and (5) the coal was transported entirely within Alabama from the Shannon Mine site to the Calera Facility by Alabama companies.  ECF No. 12 at ¶ 7.  RJR supports these claims with the Robinson Declaration.  *See* ECF No. 13-1.

RJR cites *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 477 (8th Cir. 2012) in support of its motion.  In *Dairy Farmers*, the Eighth Circuit affirmed the district court's dismissal for lack of personal jurisdiction after finding that Plaintiff had not alleged sufficient minimum contacts between Defendant and Missouri, the forum state.  *Id.* at 479.  Plaintiff Dairy Farmers alleged that defendant Bassett & Walker International, Inc. ("B&W") failed to pay for a delivery of non-fat dry milk.  *Id.* at 474.  Dairy Farmers was a Kansas cooperative with its principal place of business in Missouri, and B&W was a Canadian corporation with its principal place of business in Toronto, Ontario.  Between July 2009 and February 2011, B&W purchased over 3.5 million pounds of dairy products from Dairy Farmers in about eighty (80) transactions totaling $5,000,000.  The parties did not have any written contract and agreed to each transaction by phone.  B&W dealt primarily with a sales agent at Dairy Farmers who had his home office in Michigan.  Dairy Farmers' sales agent traveled to Missouri three to four days a month and received approval for each transaction with B&W from Dairy Farmers' Missouri headquarters.  *Id.*  B&W also communicated by phone and email with Dairy Farmers' headquarters in Missouri about delivery and billing.  In March 2011, B&W used a line of credit to purchase non-fat dry milk, sending a confirmation of the agreement to Dairy Farmers' Missouri headquarters.  The product was to be shipped from

Colorado to Mexico.  Dairy Farmers did not manufacture any products in Missouri.

When B&W failed to pay, Dairy Farmers filed suit in the Western District of Missouri.

*Id.*

The district court dismissed the case for lack of personal jurisdiction, and the

Eighth Circuit affirmed.  *Id.* at 474, 479.  The district court found that B&W did not

make a contract in Missouri under the terms of Missouri's long-arm statute, and Dairy

Farmers did not raise the issue on appeal.  *Id.* at 476.  With respect to due process, the

Eighth Circuit noted Dairy Farmers' activities in Missouri, such as determining the price

and quantity of products it offered to customers, processing purchase orders, generating

invoices, processing payments, coordinating inventory, and administering the preparation

of shipping documents.  *Id.* at 478.  The *Dairy Farmers* court also recognized that B&W

"solicited [Dairy Farmers'] business knowing that [Diary Farmers] had a Missouri

headquarters."  *Id.*

With these alleged contacts in mind, the court found that "the nature and quality of

Bassett's contacts with Missouri do not support jurisdiction under the Due Process

Clause."  The court found that no "prior negotiations" had occurred in Missouri.  It also

found that Dairy Farmers' headquarters activities could not support jurisdiction because

the contract "did not contemplate that [Dairy Farmers] would perform coordination and

processing in Missouri."  Further, B&W's contract to purchase product manufactured in

Colorado for delivery to Mexico and to remit payment in Illinois could not have alerted

B&W that it should reasonably anticipate being called into court in Missouri.  *Id.* at 479.

Similarly, the court found that B&W's incidental communications with DFA's Missouri

headquarters could not support the exercise of jurisdiction.  *Id.*

MLC attempts to distinguish *Dairy Farmers,* citing to: (1) RJR's solicitation of MLC's business in Missouri; (2) RJR's ongoing contact with MLC's Missouri personnel, including negotiations regarding the formation and maintenance of the Agreement; and (3) the Agreement's requirement that RJR send all invoices to MLC's representative in Missouri.  *See* ECF No. 17 at 11–12.  But MLC's first contention fails, as the *Dairy Farmers* court, like here, recognized that B&W solicited Dairy Farmers' business in Missouri.  *See Dairy Farmers*, 702 F.3d at 478.  Second, while RJR's contacts with MLC in Missouri were ongoing, these contacts were conducted by phone or email and remained incidental to the contract's main purpose, i.e., the mining, sale, and shipment of coal from RJR's mine in Alabama to MLC's Calera, Alabama facility.  Finally, the Agreement's requirement to send all invoices to MLC's employee in Missouri is not materially different from the situation in *Dairy Farmers* where the Eighth Circuit noted that Dairy Farmers processed payments and invoices in Missouri.  Taken together, the only real distinction between these cases is that RJR negotiated the Agreement with some MLC employees who were located in Missouri.  That distinction alone is insufficient to support jurisdiction over RJR.  *See Fastpath*, 760 F.3d at 823 (finding that specific personal jurisdiction did not lie in Iowa even when defendant solicited contract negotiations knowing plaintiff was an Iowa corporation, as such an approach to the minimum contacts analysis "impermissibly allows a plaintiff's contacts with the defendant and the forum to drive the jurisdictional analysis.") (quoting *Walden v. Fiore*, 571 U.S. 277, 289 (2014)).

11

MLC relies on *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) and *Angelica Corp. v. Gallery Mfg. Corp.*, 904 F. Supp. 993, 997 (E.D. Mo. 1995).  But these cases are distinguishable.

In *Burger King*, a case alleging breach of franchise obligations and trademark infringement, the United States Supreme Court found that the Michigan-based defendants who had entered into a 20-year franchise agreement with the Miami-based plaintiff were properly subject to personal jurisdiction in the Southern District of Florida.  *Burger King*, 471 U.S. at 487.  The Court noted that one of the defendants had traveled to Florida to complete franchise training before finalizing the franchise agreement; by entering into a 20-year agreement, defendant "envisioned continuing and wide-reaching contacts with Burger King in Florida" that included "exacting regulation of his business from Burger King's Miami headquarters" such that defendants' relationship to Burger King could not be viewed as "random," "fortuitous," or "attenuated"; and that the defendants' refusal to make payments to Miami and his continued use of Burger King's trademarks and confidential business information caused foreseeable injuries to Burger King in Florida. *Id.* at 479–80 (citations omitted).  The Court also noted that the contract documents "emphasize that Burger King's operations are conducted and supervised from the Miami headquarters, that all relevant notices and payment must be sent there, and that the agreements were made in and enforced from Miami," and further cited the course of dealing, which continuously indicated to defendants that all of Burger King's decision-making authority was vested in its Miami headquarters. *Id.* at 479–81.

Though some of these factors are analogous to the facts of this case, the Court

12

finds that the comparisons are not sufficient for it to find personal jurisdiction over RJR. While MLC has experienced injury in Missouri, that alone is not enough to find jurisdiction. *See Fastpath*, 760 F.3d at 822 ("That an Iowa company felt [defendant's] breach does not mean that an Iowa court has jurisdiction over the non-resident defendant consistent with due process."). No RJR employee has traveled to Missouri in connection with the Agreement. More importantly, the relationship here is not a franchise relationship that contemplates "exacting regulation" of RJR's business by MLC. To the contrary, it is a mere buyer/seller relationship. The Agreement does not "emphasize [MLC]'s operations are conducted and supervised from the [Missouri] headquarters," nor specify that it was made in and enforced in Missouri. To the contrary, the Agreement states that it is governed by Alabama law.

Although *Angelica* presents a closer case, the Court is not persuaded that *Angelica* is sufficiently similar to require finding personal jurisdiction over RJR. *Angelica* was a contract dispute between two garment manufacturers, Angelica Corporation, a Missouri corporation with its principal place of business in Missouri, and Gallery Manufacturing Corporation, a California corporation with its principal place of business in Florida. *Angelica*, 904 F. Supp. at 994. Representatives of the two companies met at trade shows outside of Missouri. Angelica eventually contacted Gallery to suggest a business agreement for the manufacture of two styles of shirts. The parties exchanged samples, and Gallery proposed two contracts for the manufacture of a total of four styles of shirts, which Angelica accepted in Missouri. A dispute over the fitness of the shirts arose, and Angelica filed an action against Gallery in the Eastern District of Missouri. *Id.* at 994–

95. The court ultimately found that "while the quantity of contacts is not great, the nature and quality of defendant's contacts with Missouri are substantial enough such that asserting personal jurisdiction over Gallery comports with the dictates of due process." *Id.* at 997. In particular, the court found that Gallery had "purposefully availed" itself of the privilege of conducting business in Missouri when it "purposefully directed" its activities at a Missouri resident by making solicitation calls to Missouri; pursuing contracts with Angelica's representatives in Missouri; entering into a contract with a Missouri resident in Missouri; sending samples to Angelica in Missouri; and carrying on active correspondence with Angelica in Missouri via telephone, fax, and mail. *Id.*

At the outset, the Court notes that *Angelica*, a district court decision, predates more recent Eighth Circuit caselaw holding that contacts similar to those at issue here were insufficient to satisfy due process. *See Dairy Farmers*, 702 F.3d 472 (8th Cir. 2012); *Fastpath*, 760 F.3d 816 (8th Cir. 2014). Moreover, the nature, quantity, and quality of RJR's contacts with Missouri and the relationship between those alleged contacts and the action distinguish this case from *Angelica*. The parties in *Angelica* entered into more than one contract, while there is no evidence that the parties here entered into multiple agreements. The defendant in *Angelica* sent multiple samples to Missouri as part of the negotiations for, and maintenance of, its contracts with the Missouri plaintiff. Here, none of the coal subject to the Agreement left Alabama at any time. Further, evidence and allegations of ongoing contacts between the defendant and plaintiff's employees in Missouri were more substantial in *Angelica* than what is alleged by MLC. MLC only directly alludes to a handful of specific discussions relating to the

14

Agreement.  Also, while MLC describes negotiations between the parties relating to the Agreement, the content and specificity of such discussions are unclear.  Mere phone calls and emails to Missouri do not create a "substantial connection" to Missouri sufficient to subject RJR to personal jurisdiction in Missouri.  *See Fastpath*, 760 F.3d at 824.  In addition, the court in *Angelica* emphasized that the defendant only spoke with Angelica representatives in Missouri.  But here, RJR dealt with MLC's representatives in Alabama with respect to day-to-day aspects of inventory and delivery.  Indeed, MLC's Counts III and IV for breach of contract relating to overcharging arise directly from RJR's communication with MLC in Alabama.  ECF No. 1 at ¶ 34 ("During a visit by Ms. Bailey to RJR's facility. . . ."); *see also id.* at ¶¶ 38–41.  There is no indication in *Angelica* that a communication that took place entirely outside the forum state became the basis for any of plaintiff's claims as is true here.  Finally, while MLC alleges the Agreement was entered into in Missouri—a question this Court does not reach—it is explicitly governed by Alabama law.  Taken together, the nature and quantity of RJR's contacts with Missouri, the quality of those contacts, and the relationship between those contacts and the action weigh against the Court exercising personal jurisdiction over RJR.  *See Fastpath*, 760 F.3d at 824.

The remaining two *Fastpath* factors do not alter the Court's analysis.  MLC was injured in Missouri, so Missouri courts have an interest in this litigation.  But, while this factor weighs in favor of finding personal jurisdiction over RJR, that MLC was harmed in Missouri is not sufficient to confer jurisdiction.  *See id.* at 822.  The final factor, the convenience of the parties, does not favor either party.  Both parties would be

15

inconvenienced by litigating in the other's choice of forum.  If anything, RJR has established that it will be more inconvenienced by litigating in Missouri compared to the inconvenience MLC would suffer by litigating in Alabama, where MLC admits that some of its witnesses reside.  *See* ECF No. 17-2 at ¶ 16 ("Jackie Carpenter and a small number of other employees handled certain day-to-day aspects of coal inventory and deliveries at the Calera facility, [sic] and will have some knowledge of the supply problems caused by RJR.").

Considering the *Fastpath* factors and the arguments presented by the parties, the Court finds that the exercise of personal jurisdiction over RJR does not comport with due process.

Because the Court finds that RJR lacks sufficient minimum contacts with Missouri, and therefore lacks jurisdiction over this matter, it does not address RJR's arguments related to that place of contract formation for the purpose of Missouri's long-arm statute, venue under Fed. R. Civ. P. 12(b)(3), or RJR's alternative request for transfer to the Northern District of Alabama under 28 U.S.C. 1404(a).

**Conclusion**

Accordingly,

**IT IS HEREBY ORDERED** that RJR Mining Company's motion to dismiss is

**GRANTED,** and Mississippi Lime Company's claims against RJR will be **DISMISSED**

**without prejudice** for lack of personal jurisdiction.  ECF No. 12.  The Court will enter a

separate Order of Dismissal.

Dated this 27th day of July, 2023.


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE